UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

   vs.                         REPORT AND RECOMMENDATION

Lamont Vernon Peterson,
Owen Kent Peterson,
Alan Victor Peterson,
Corwin Douglas Peterson,
Rebecca Jean Van Vickle,

        Defendants.       Crim. No. 04-268(01-05)(RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendants:

     1.    The Defendants' Joint Motion to Dismiss as Specific Performance of the Government Agreement Not to Prosecute.

     2.    The Defendants' Joint Motion to Suppress.

A Hearing on the Motions was conducted on October 19, 2004, at which time, the Defendant Lamont Vernon Peterson ("L. Peterson") appeared personally, and by Joseph S. Friedberg, Esq.; the Defendant Owen Kent Peterson ("O. Peterson") appeared personally, and by Kent David Marshall, Esq.; the Defendant Alan Victor Peterson ("A. Peterson") appeared personally, and by Peter B. Wold, Esq.; the Defendant Corwin Douglas Peterson ("C. Peterson") appeared personally, and by John C. Brink, Esq., and Daniel L. Gerdts, Esq.; the Defendant Rebecca Jean Van Vickle ("Van Vickle") appeared personally, and by Dean S. Grau, Esq.; and the Government appeared by William H. Koch ("Koch"), Assistant United States Attorney.

For reasons which follow, we recommend that the Defendants' Joint Motion to Dismiss as Specific Performance of the Government Agreement Not to Prosecute be denied, and that their Joint Motion to Suppress be denied.[1]

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendants' Motion to Suppress Statements, Admissions, and Answers. Leave was granted, and the parties' briefs were received by January 14, 2005. However, the Defendants interposed an objection to materials, which were attached to the Government's brief, and we scheduled a Hearing for February 7, 2005, in the event that further argument was necessary, at which time, the Motions were taken under advisement, as no further materials, or

(continued...)

II. <u>Factual Background</u>

L. Peterson is charged, in a Superseding Indictment, with one Count of Conspiracy, in violation of Title 18 U.S.C. §371; five Counts of Making False Statements in Farm Operating Plans, in violation of Title 18 U.S.C. §2, and Title 15 U.S.C. §714m(a); seven Counts of Making False Statements in Acreage Reports, in violation of Title 18 U.S.C. §§2 and 1014; six Counts of Making False Statements in Production Worksheets, in violation of Title 18 U.S.C. §§2 and 1014; eighteen Counts of Mail Fraud, in violation of Title 18 U.S.C. §§2 and 1341; ten Counts of Wire Fraud, in violation of Title 18 U.S.C. §§2 and 1343; one Count of Tampering with a Witness -- namely, Unindicted Co-Conspirator 3, in violation of Title 18 U.S.C. §§1512(b)(3)

---

[1](...continued)
argument, were advanced at that time. See, <u>Title 18 U.S.C. §3161(h) (1)(F) and (J)</u>; <u>Henderson v. United States</u>, 476 U.S. 321, 330-32 (1986); <u>United States v. Blankenship</u>, 67 F.3d 673, 767-77 (8th Cir. 1995).

With regard to the Defendants' Motion to Strike the Government's Response, they argue that the Government improperly attached an Exhibit, which is comprised of sixty-five (65) pieces of correspondence, that were authored by one or another of the Defendants, by their legal counsel, or by counsel for the Government, and which was never offered at the Hearing. For these purposes, we find that the Government's Exhibit is unnecessary to our determination of the issues presented, and we have not considered the contents thereof, in rendering this Report and Recommendation. Accordingly, we deny the Defendants' Motion to Strike, as moot.

and (i); and one Count of Tampering with a Witness, in violation of in violation of Title 18 U.S.C. §§1512(b)(3) and (i).

O. Peterson is charged with one Count of Conspiracy, in violation of Title 18 U.S.C. §371; two Counts of Making False Statements in Farm Operating Plans, in violation of Title 18 U.S.C. §2, and Title 15 U.S.C. §714m(a); three Counts of Making False Statements in Acreage Reports, in violation of Title 18 U.S.C. §§2 and 1014; three Counts of Making False Statements in Production Worksheets, in violation of Title 18 U.S.C. §§2 and 1014; six Counts of Mail Fraud, in violation of Title 18 U.S.C. §§2 and 1341; and six Counts of Wire Fraud, in violation of Title 18 U.S.C. §§2 and 1343.

A. Peterson and C. Peterson are both charged with one Count of Conspiracy, in violation of Title 18 U.S.C. §371; one Count of Making False Statements in Acreage Reports, in violation of Title 18 U.S.C. §§2 and 1014; and four Counts of Mail Fraud, in violation of Title 18 U.S.C. §§2 and 1341.

Van Vickle is charged with one Count of Conspiracy, in violation of Title 18 U.S.C. §371; three Counts of Making False Statements in Farm Operating Plans, in violation of Title 18 U.S.C. §2, and Title 15 U.S.C. §714m(a); three Counts of Making False Statements in Acreage Reports, in violation of Title 18 U.S.C. §§2 and 1014;

- 4 -

three Counts of Making False Statements in Production Worksheets, in violation of

Title 18 U.S.C. §§2 and 1014; eight Counts of Mail Fraud, in violation of Title 18

U.S.C. §§2 and 1341; and four Counts of Wire Fraud, in violation of Title 18 U.S.C.

§§2 and 1343.

All of the alleged violations are said to have occurred on various dates from on

or about January of 1996, until on or about October of 2003, in this State and District,

and elsewhere, as more specifically detailed in the Superseding Indictment.   See,

Docket No. 49.  As pertinent to those charges, and to the Motions pending before us,

the operative facts may be briefly summarized.[2]

Thomas L. Carlson ("Carlson"), who is a Special Agent with the United States

Department of Agriculture Office of the Inspector General, and the case agent, testified

at the Hearing.  Carlson has been a Special Agent for nearly ten years, having been

---

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."   As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

employed by the Agriculture Office since August of 1997, and with the United States Customs Service, in Arizona, prior to that time.

In January of 2000, Carlson contacted some of the Defendants, who were subjects of an investigation into violations of the payment limitation provisions. At that time, Carlson asked those individuals to sign releases. Rodney Rinderknecht ("Rinderknecht")[3] returned two releases, dated January 4, 2000,[4] concerning, in part, Key West Farms; Van Vickle executed a release on January 5, 2000; and L. Peterson executed three releases, dated January 5, 2000, February 5, 2000, and November 15, 2000, which are, in part, for his loan documents, as well as information pertaining to Peterson Farms, Division 3 Farms, and L. Peterson. See, Government Exh. 1. Carlson testified that he did not request any releases, other than those which are contained in Government Exhibit 1.

Following Carlson's meeting with some of those individuals, in January of 2000, he received a letter, which was dated January 20, 2000, from Kevin Duffy ("Duffy"), in which Duffy related that he was aware of Carlson's investigation into the program

---

[3]Rinderknecht is a purported fifty percent partner in Key West Farms, of which Van Vickle is the other partner.

[4]Carlson testified that the date of January 4, 1999, on the second page of Government Exhibit 1, was a typographical error, and that it should have been 2000.

payments, that would have been received by two partnerships -- namely, Key West Farms and Peterson Farms -- during the 1999 growing season, and that he knew that Carlson had met with Van Vickle and L. Peterson.  Duffy requested that Carlson make all future contacts through his office, including for the purpose of arranging additional interviews, and he stated that the partners of the farm partnerships were willing to cooperate with the investigation.  See, <u>Government Exh. 2</u>.  After Carlson received Duffy's letter, he had discussions with Duffy but, at no time, from January 20, 2000, through July 27, 2001, did Duffy inquire about the status of any criminal investigation into the two farms, nor did Carlson inform Duffy, or the Petersons, that the United States Attorney's Office was considering criminal charges.

On July 27, 2001, Carlson met with Duffy, L. Peterson, and C. Peterson, at the Federal Courthouse in Fergus Falls, Minnesota.  Carlson testified that the purpose of the meeting was to interview C. Peterson, but that he interviewed L. Peterson as well, because he was also present.  During that meeting, Carlson asked questions, and took notes.  See, <u>Government Exhs. 3-4</u>.  Carlson stated that he allowed L. Peterson to be present for the interview of C. Peterson, so long as he did not answer any questions on behalf of C. Peterson.  After Carlson interviewed C. Peterson, he asked L. Peterson some follow-up questions.  When L. Peterson and C. Peterson requested

copies of Carlson's notes, Carlson stated that they could have copies if they first signed off on the notes, which they did, and Carlson and Duffy retrieved copies for them.  Prior to obtaining the signatures of those Defendants, Carlson reviewed his notes so as to ensure that they accurately represented the interview, and he stated that, had the Petersons mentioned that any of the information was wrong, Carlson would have made the corrections to his notes.

Also on the date of the meeting, Duffy inquired into the status of the case, and Carlson replied that he had received a letter[5] from the United States Attorney's Office, declining the case criminally, based on the information that had been provided to the United States Attorney's Office, as of that date.  Carlson explained to the individuals, at the meeting, that the case could still proceed civilly and/or administratively, and he conveyed to them, at that time, his honest belief that it would be a civil or administrative case, because Carlson was aware that it was no longer a criminal case. Carlson further testified that, whenever he interviews a subject of an investigation, he identifies himself as a criminal investigator with the Department of Agriculture

---

[5]Carlson did not have a copy of the letter in his possession, at the Hearing. Carlson received the letter in the third or fourth week of May of 2001, but for some reason, he did not open it until the first or second week of June of 2001.

Inspector General's Office, he explains that he is conducting an investigation that could proceed criminally, civilly, and/or administratively, and he cautions that he does not make that determination, but rather, he reports the facts to the United States Attorney's Office.  Carlson stated that he does not have any reason to believe that he did anything other than follow his normal practice in this instance, and he stated that he did not tell Duffy, or any of the Defendants, that there would be no future criminal prosecution.

After Carlson informed Duffy and the Petersons, at the meeting on July 27, 2001, that the case had been declined criminally, they did not ask for clarification, nor did Carlson recall much reaction from them.  Carlson denied that they were shocked at his revelation, or that L. Peterson responded by saying:  "Criminal, what are you talking about," "we're not criminals," or "we had no idea this was criminal."  Carlson testified that L. Peterson stated that he did not think that he had done anything wrong, and Carlson believed that the Petersons were aware that the case had a criminal, civil, and administrative potential.  Carlson further testified that his notes do not reference his communication that the criminal prosecution had been declined, or the Petersons' reaction, or absence thereof, because they were his interpretation of what was said during the meeting, and he did not see any reason to make a written record of that

advisement.  Following the meeting on July 27, 2001, Carlson did not ask for, or receive any more releases, and he did not participate in any additional interviews, although he was present during a settlement, or negotiation discussion, which occurred in the Fall of 2003, between Greg Brooker ("Brooker"), who is an Assistant United States Attorney who is handling the civil portion of the case, L. Peterson, and O. Peterson, at which Duffy was also present.[6]

On February 22, 2003, L. Peterson mailed a letter to Brooker, a copy of which was forwarded to Carlson, about a week after Brooker received it.  See, <u>Government Exh. 5</u>.  Carlson testified that he had informed L. Peterson, prior to the writing of that letter, that the criminal prosecution had been declined, and L. Peterson had not been told any differently, in the intervening time.  To put the writing of the letter in context, Carlson stated that, in the months prior to its creation, the Farm Service Agency, which administers the farm programs in question, made an administrative determination to withhold all future farm program payments.  Carlson stated that the outcome of the

---

[6]Carlson testified that he recalled three different meetings when Duffy was also present -- namely, one in the summer of 2000, the one on July 27, 2001, and the one in the Fall of 2003.

investigation is still pending, but that he believed that L. Peterson had written the letter in response to that administrative action.

As a result of various statements made in the letter, Carlson obtained administrative, or Office of Inspector General ("OIG") Subpoenas, and he sent the Subpoenas to Ag Services of America, from which the farming operations received their operating loans. See, Government Exh. 6. Eight Subpoenas were issued, in March of 2003, all of which contained similar language, except that the individuals' names were different, and a list of documents that were requested was attached. Carlson testified that he drove to Ag Services, in order to review their files, and he marked the documents that he wanted copied, which were later mailed to him. Carlson received those documents sometime before September of 2003.

The Subpoenas were served under the Right to Financial Privacy Act, which is designed to allow the individual, whose records are requested, an opportunity to object to their disclosure. The individual receives a copy of the Subpoena, as well as a boilerplate document, which advises them of their right to file a Motion to prevent the disclosure. Carlson testified that either he, or Rob Wagner ("Wagner"), who served the Subpoenas, would have mailed the copies to the individuals. As related by Carlson, the Subpoena concerns the investigation into alleged false claims, alleged

false statements, and alleged violations of payment limitation regulations, relating to the Risk Management Agency, and the Farm Service Agency, United States Department of Agriculture. No objections were filed by any of the Defendants, in response to the Subpoenas.

In the Fall of 2003, Carlson and Brooker met with L. Peterson, O. Peterson,[7] and Duffy, in Crookston, Minnesota, at a restaurant, or bar, which was located across from the hotel where Carlson was staying. Carlson described the meeting as mainly a conversation between the attorneys, and he did not recall the issue of a criminal prosecution arising, because Brooker handled the civil portion of the case. However, at some point in time during the meeting, the Petersons and Duffy said, to Carlson, that he had told them that the case would be civil and administrative, that the criminal proceedings were over, and that there would not be any criminal proceedings in the future. Carlson began to respond, by saying "I did not," but then Brooker put up his hand to stop him from saying anything more. Carlson did not recall Brooker asking him whether he had said that to them. When asked whether one, or both, of the

---

[7]Carlson first interviewed O. Peterson in the summer of 2000, in Fergus Falls, at which meeting, Duffy was also present. Carlson denied that he told O. Peterson, at that initial meeting, that he was conducting a civil investigation.

Petersons swore at him, Carlson replied that there was some angry commentary, and that someone -- either L. Peterson or O. Peterson -- made a remark, which was similar in nature to an accusation that Carlson was lying.  Carlson testified that, during the meeting, neither L. Peterson, nor O. Peterson, gave any statements.

Then, in September of 2003, Carlson conducted an interview of Patty Peterson ("P. Peterson"), who is the ex-wife of L. Peterson.  During that interview, Carlson obtained a sworn statement from P. Peterson, who told him that the information contained in certain documents, which related to the case, was not true.  Carlson testified that, in June of 2000, he had conducted an interview with all of the Petersons, in Fergus Falls, with Duffy present.  P. Peterson reported to Carlson that, prior to that interview, L. Peterson and O. Peterson had instructed her not to tell the truth, during the interview in June of 2000.

In October of 2003, Carlson met with Rinderknecht, Bruce Hanley ("Hanley"), who is Rinderknecht's attorney, and Brooker.[8]  Another attorney was present with

_____

[8]Carlson testified that he first interviewed Rinderknecht on January 4, 2000, and that he also had a telephone conversation with Rinderknecht, concerning another farming operation that Rinderknecht had managed in the past.  Additionally, Carlson testified about a meeting he had with Rinderknecht, in the Fall of 2003, where Brooker and Mark Price, who is from the Federal Crop Insurance Corporation, were also

(continued...)

Hanley, but Carlson could not recall that individual's name.  Carlson had originally

interviewed Rinderknecht on January 4, 2000.  Prior to that meeting, on January 4,

2000, Carlson telephoned Rinderknecht, and informed him that Carlson was on his

way.  When Carlson arrived, Rinderknecht had "stickie notes" placed on his desk.

Carlson asked Rinderknecht basic questions in order to determine whether he was

making the management decisions for one of the farming operations, such as where

Key West Farms had its bank account, and who had signature authority on the bank

account.  In answering Carlson's questions, Rinderknecht read some of his answers

from the "stickie notes" on his desk.  At the time of that interview, Rinderknecht stated

that he had written the notes, so as to organize his responses to certain questions,

which he knew would be asked.  However, at the meeting in October of 2003,

Rinderknecht reported that he had actually telephoned L. Peterson, who had provided

him with the answers to give, in response to Carlson's questions.  Additionally,

Rinderknecht stated that L. Peterson had directed him to sign several blank checks,

so that it would appear that Rinderknecht was making the management decisions for

---

[8](...continued)
present, another meeting with Rinderknecht and Hanley, and one final meeting with
Rinderknecht and William H. Koch, Assistant United States Attorney.

the farming operations.  After Carlson's meetings with P. Peterson, and Rinderknecht, Carlson again presented the matter to the United States Attorney's Office for criminal consideration, based on the newly obtained evidence, as well as the earlier findings that the matter would be criminal.

Carlson testified that, in his nearly ten years of experience as a Special Agent, he has never been authorized to enter into plea negotiations with the subjects, or targets, of his investigations.  Further, Carlson did not receive any such authorization, or direction, from the United States Attorney's Office for the District of Minnesota, and he did not represent to any of the Defendants, or to Duffy, that he had such authority.[9]

Next, Duffy testified that he was initially contacted by the Petersons who, in turn, had been contacted by Carlson, and that they[10] wanted Duffy to represent them,

---

[9]During cross-examination, Carlson testified that he interviewed Alan Peterson in the beginning of July of 2001, at his home in Idaho, after Carlson had received the declination letter.

[10]Duffy later clarified that he initially represented Peterson Farms, which consisted of Vernon Peterson, Shirley Peterson, who was his wife, and their sons -- namely, L. Peterson, O. Peterson, C. Peterson, and A. Peterson -- in the civil matter. After the Indictment was issued, Duffy met with the Assistant United States Attorney, in an effort to reach a "global settlement."  However, when Duffy realized that such a settlement would be unobtainable, and that the criminal matter would proceed, he had
(continued...)

- 15 -

in relation to the investigation.   After that, Duffy began his representation, and he contacted Carlson.   Duffy testified that he did not have an in-person meeting with Carlson, prior to the dates that Carlson mentioned, but rather, that he sent Carlson the letter of representation, and that the correspondence regarding the releases may have been done entirely through the mail.

At some point in time, Duffy concluded that he would be representing the Petersons in a specific type of case.   Duffy explained that, after being advised by Carlson that he was investigating the matter on behalf of the OIG, Duffy informed Carlson that he was representing Peterson Farms, which consisted of the mother, father, and several brothers.   Duffy testified that, had he any intimation that there would be a criminal aspect to the case, he would have withdrawn, because he could not have represented all five of the individuals, and he would have had them obtain separate

---

[10](...continued)
his clients contact separate defense attorneys, and Duffy withdrew from the criminal case, in which he had never made an appearance in Federal Court.   Duffy stated that he was still listed as the attorney of record for L. Peterson, in the civil case.   Duffy also mentioned that, during the course of negotiations between himself and Brooker, he had executed several agreements, which extended the jurisdiction to file the Complaint.   While, initially, Duffy executed those agreements on behalf of all the parties, everyone individually signed the last one.

legal counsel.[11]   Duffy stated that Carlson did not say what kind of case it was, and he acknowledged that Carlson had not told him that the matter was solely a civil investigation, and that Duffy had made his own assumption that it was civil.

Duffy testified that, prior to July 27, 2001, Carlson never told him that he was investigating a criminal case. On that date, Duffy attended a meeting in the conference room of the Federal Courthouse in Fergus Falls, Minnesota, for which he had to drive two hours and fifteen minutes.   Duffy understood that Carlson wanted further information for his investigation, and that he wanted to ask some questions, and Duffy stated that he and his clients were prepared to cooperate, because he still believed that the case was a civil investigation, which might involve the repayment of some money, if they had violated a rule, or a regulation, that they had not properly interpreted.

---

[11]On cross-examination, Duffy acknowledged that potential conflicts of interest also occur in civil representation, and that Brooker had inquired as to whether there was a conflict with Duffy's representation in that matter, but Duffy opined that there was not a conflict.   Duffy further related that he had spoken with C. Peterson, A. Peterson, O. Peterson, and Van Vickle, but he did not recall speaking with the Petersons' parents, or Rinderknecht, even though Rinderknecht was a fifty percent partner in Key West Farms.   However, Duffy stated that Rinderknecht knew of the representation, and Rinderknecht never mentioned that there might be a problem in that regard.

According to Duffy, one of the first statements that Carlson made at the meeting, was that he had presented the case to the prosecutors in Minneapolis, Minnesota, and that there would not be any prosecution from that point forward. Duffy could not recall whether he or L. Peterson spoke first, but Duffy commented that it would have been nice to know that it was a criminal prosecution. With regard to L. Peterson, Duffy testified that he was very angry, and that he said something like "you think we're a bunch of crooks here or something," and that "this was never a criminal thing." Duffy could not recall how, or if Carlson responded to their comments, and he also did not remember C. Peterson making any comments. In addition, Duffy testified that Carlson specifically told them that, from that point forward, the case would be civil or administrative.

However, Duffy later testified that he did not recall exactly what he, or Carlson said, and he did not write the comments down, follow up with a letter to Carlson, or communicate with the United States Attorney's Office, until the Fall of 2003, or early 2004, when he wrote to Brooker. Thus, there was no effort to document any alleged assurance, promise, or guarantee, that there would be no criminal prosecution, until Duffy's letter to Brooker, and Duffy never recorded any such alleged promise in his notes. Duffy further acknowledged that, while he assumed that Carlson was

representing "you people" -- namely, the United States Attorney's Office -- he never checked with the United States Attorney's Office, nor did he ask Carlson whether he had the authority to speak on behalf of the United States Government.  Additionally, in Duffy's extended discussions with the United States Attorney's Office, about the possibility of a "global settlement," Duffy never mentioned any alleged promise that there would not be any criminal prosecution,[12] nor did Brooker or Koch ever make any direct statements about the nonprosecution of the Defendants.   However, Duffy assumed that Carlson had spoken with someone at the United States Attorney's Office.  Duffy recalled that Koch raised the potential conflict of interest in representing all of the Defendants in the criminal case.

When asked whether facts can develop in an investigation that could lead to different conclusions than those that were reached earlier, Duffy replied that a person does not get charged until the facts are known, and that there is no post-investigative work done, which would cause the charges to be changed.  However, Duffy agreed that an investigation might lead in many different directions, and that the nature of a

---

[12]Duffy testified that, prior to the meeting about a "global settlement," he had spoken with O. Peterson, L. Peterson, A. Peterson, and Van Vickle, but he was unsure of whether he had spoken with C. Peterson.

case could change, if new evidence were discovered.  Duffy also acknowledged that there was a difference between a statement that the case was declined for prosecution on a certain date, and a promise of lifetime immunity.

Based on Carlson's representation, on which Duffy relied, Duffy saw no reason not to allow his clients to continue cooperating, in an effort to settle the matter, possibly through the payment of some money, and he continued to advise his clients, while operating under the belief that the case would be civil and/or administrative. When asked to describe, specifically, what actions he took in reliance on Carlson's statement, Duffy responded that he continued to stay at the meeting, and he allowed his clients to be interviewed, both of which he had anticipated doing, prior to July 27, 2001.  Referencing Duffy's letter of January 20, 2000, in which he stated that it was the intent of the partners of the partnerships to cooperate with the investigation, Duffy testified that they had fully cooperated, and that nothing changed following the meeting on July 27, 2001, other than that the partners became more skeptical of Carlson. However, Duffy stated that he did not recall any subsequent meetings, at which Carlson interviewed his clients,[13] nor did he recall any releases that were signed after

_____

[13]Duffy testified that he believed that Carlson had interviewed A. Peterson, in
(continued...)

that date.  Duffy also referenced a letter that he sent to Brooker, as well as the letter from L. Peterson,[14] some further cooperation with Ag Services of America, and his decision not to contest the Subpoenas that were issued.  He stated that he relies on a person's word on many occasions, or with a handshake, without formally committing it to writing.

Duffy related the circumstances which surrounded the next meeting in the Fall of 2003, at which he, L. Peterson, O. Peterson, Brooker, and Carlson were present. The meeting occurred on October 20, 2003, at the Northland Inn in Crookston, which is a hotel with a bar and a restaurant attached to it.  By that time, Duffy had been served with the civil Complaint, which had not been formally filed with the Clerk of the

---

[13](...continued)
Idaho, sometime before the meeting on July 27, 2001.  Although Duffy had earlier completed an appeal for Division 3 Farms, prior to the inception of the present case, he never represented A. Peterson, C. Peterson, or Division 3 Farms, in connection with this case.

[14]Duffy stated that he instructed L. Peterson to write a letter, see Government Exh. 5, which he would not have done had he had any intimation of a criminal investigation, because of the admissions that L. Peterson made throughout the letter. Duffy could not recall if he reviewed the letter, but the letter suggests that he and L. Peterson discussed it.  Specifically, the letter discusses whether or not the Farm Service Agency ("FSA") was going to release funds for the upcoming crop year, and Duffy testified that Brooker contacted him, and asked him to have L. Peterson write the letter, so that Brooker could approach the FSA, with an argument in support of the release of the funds.

United States District Court.  Duffy testified that the parties were still attempting to settle the case, by arriving at a dollar figure, and that Brooker had been communicating with the FSA, in Washington, D.C.  Brooker had always informed Duffy that he was with the Civil Division of the United States Attorney's Office, and therefore, he could handle the civil and the administrative sides of the case.

At some point during the meeting, the topic of a criminal prosecution arose, and Brooker reportedly commented that he was not involved with that.[15]  O. Peterson and L. Peterson stated that the criminal prosecution was not an issue, because they had been told that there would not be one.  Duffy confirmed, to Brooker, that Carlson had told them that at the first meeting, and Brooker then turned to Carlson, and asked him whether he had made that statement.  In response, Carlson began to deny it, and Brooker told him not to say anything more.  However, O. Peterson heard Carlson say "no," and he pointed his finger at Carlson, and swore, "You * * * liar."  Carlson did not react to O. Peterson's accusation, other than to sheepishly lower his head.  The Petersons again attempted to confront Carlson, by saying, "You said that, didn't you."

---

[15]Duffy could not recall how the topic of criminal prosecution arose, but he did state that the meeting was basically a conversation between himself and Brooker, and that, at times, it was similar to a mediation.

Since Brooker had already instructed Carlson not to speak, Carlson did not respond, and O. Peterson again cursed at Carlson, and said, "You're a * * * liar."

Duffy testified that he believed that Brooker was being honest with him, but that suddenly, he and his clients were again confronted with a criminal situation, which they believed had been concluded.  Duffy reiterated that Carlson had stated, on July 27, 2001, that the Federal prosecutors were dropping the case, and that, from that point forward, it would be a civil and administrative matter, and based on that comment, Duffy had agreed to allow his clients to speak to Carlson, on that day, and on future occasions.

Duffy stated that he has had fairly extensive experience with the Federal farm programs, having done work with them since the mid-1980s, as well as Chapter 12 reorganizations, which deal with FSA regulations.  However, Duffy's experience was limited to civil or administrative cases, as opposed to criminal matters, within the FSA programs, and he was only vaguely aware of the potential for criminal liability in those program areas, prior to becoming involved in the Petersons' case.  As far as Duffy's prior experience with criminal law, he testified that he was an Assistant County Attorney for Beltrami County, from 1981 to 1983, as well as an Assistant County Attorney in Pennington County, from 1983 through August of 1988, and that he had

performed State criminal defense work from August of 1988, through the present. Duffy has never represented any individuals who have been accused of committing white collar crimes.

Duffy could not recall when he first met with the Petersons, but he stated that it probably would have been shortly after Carlson met with them in early January of 2000, and he further testified that he did not begin his representation of them until on or about January 20, 2000.[16]  Duffy related that the Petersons paid an initial retainer payment, which he deposited into his escrow account, and he billed them hourly, drawing on the escrow account, until it was exhausted.  Duffy stated that he had a retainer agreement with the Petersons, but he had no specific recollection of who signed the agreement.

Duffy testified that he did not have a separate retainer agreement with Key West Farms, and that, instead, he billed the Peterson Farms retainer amount, because his work essentially covered both Peterson Farms and Key West Farms, in that everything was intertwined, so the billing was not separated between the two Farms.  Either L.

---

[16]However, Duffy subsequently stated that, although he had not previously represented the Petersons in other matters, his representation on this case began prior to January 20, 2000, because he would have met, and talked with them, and he would have agreed to represent them.

- 24 -

Peterson or O. Peterson signed the check, which came from Peterson Farms, and which was deposited as the retainer.  Duffy testified that he did not speak with the Petersons about billing Peterson Farms for the work that he did for Key West Farms because, in essence, Key West Farms was receiving the benefit of Duffy's work for Peterson Farms.  Neither Rinderknecht, nor Van Vickle, ever paid any of the fees for the services that Duffy performed on behalf of Key West Farms, as far as Duffy could recall, and there was not a separate representation agreement that was signed by Key West Farms, Van Vickle, or Rinderknecht, but Duffy might have included Key West Farms on the representation agreement with Peterson Farms.  Duffy stated that he would need to check the agreement in order to determine whether Van Vickle had actually signed it, along with either L. Peterson, or O. Peterson.

At Duffy's initial meeting with the Petersons, which occurred at a hotel in Fergus Falls, L. Peterson, O. Peterson, and their parents -- Vernon and Shirley Peterson -- were present.  Neither Van Vickle, nor Rinderknecht, were at that meeting. Duffy has only had brief contact with Rinderknecht, including one encounter at Duffy's office, when Rinderknecht inquired about the pending case, and what should be done.  Duffy had not met Rinderknecht prior to that meeting, of which Duffy could not recall the date, and he only knew who Rinderknecht was after Rinderknecht

introduced himself.  Nevertheless, Duffy recognized the name, as being one of the fifty percent owners of Key West Farms, with the other owner being Van Vickle.

With regard to Van Vickle, Duffy testified that he could not recall when he first met her, other than to say that it was probably after the meeting on July 27, 2001, but he stated that she was not present at any of the meetings previously discussed. Accordingly, Duffy had not personally met with either Rinderknecht, or Van Vickle, at the time that he wrote the letter of January 20, 2000, informing Carlson of his representation of Key West Farms.  He had, however, spoken with Van Vickle on the telephone, and he assumed that the conversation had taken place sometime after Carlson's initial contact with the Defendants, but prior to January 20, 2000 -- the exact date of which could probably be located in his notes.  Duffy also stated that, after Carlson contacted the Defendants, L. Peterson spoke with the Otter Tail County Attorney, who referred him to Duffy, because of his experience working with FSA and Chapter 12 bankruptcies.  Duffy posited that L. Peterson contacted the County Attorney because many of the county attorneys in northern Minnesota worked part-time, while maintaining a civil or criminal practice.

Duffy testified that he did discuss the potential criminal liability with his clients at some point in time, which his records would reflect, while, perhaps, not reflecting

the first such conversation. Duffy explained that many times, when he meets with clients in person, or speaks to them over the phone, he does not record a notation in his file. Duffy did not recall speaking with his clients about possible criminal liability, nor did he consult with any other attorneys as to the nature of his clients' liability, prior to July 27, 2001.[17]

Contrary to Duffy's testimony, L. Peterson testified that he did not write the letter, which is dated February 22, 2003, but rather, that Duffy wrote it, and L. Peterson signed it, after consulting with Duffy, and providing some of the information that was contained therein. L. Peterson stated that he knew that the letter was being sent to Brooker, who was handling the civil case. According to L. Peterson, Duffy prepared the letter, and mailed it to L. Peterson, who then signed it, and mailed it, to either Brooker directly, or back to Duffy, who mailed it to Brooker. L. Peterson could not recall whether he and Duffy had met, or spoken on the phone, concerning the contents of the letter, but he was certain that they had discussed it, before it was

---

[17]At the conclusion of the Government's cross-examination of Duffy, the Government argued that, by calling him as a witness, the Defendants had waived the attorney-client privilege, and he requested the production of all of Duffy's records, which pertained to his representation of the Defendants. The Defendants requested that the request be formally made by written Motion, to which the Government agreed, but no such Motion has ever been formally filed, at least to the best of our knowledge.

signed.  L. Peterson did not recall whether he had edited the letter in any way, but he stated that he had adopted it as true, based on the advice of his attorney.  However, L. Peterson said that he did read, and review the letter to ensure that what was written was truthful,[18] although he put his faith in his attorney.  L. Peterson also discussed the facts in the letter with O. Peterson, and possibly also with A. Peterson, and C. Peterson, through telephone conversations, to keep them informed about the investigation, but he could not recall whether they approved the letter, on their behalf. L. Peterson also believed that Van Vickle read the letter before he sent it.[19]

In writing the letter, L. Peterson did not believe that there was also a criminal case, based on the representations of Carlson during the meeting in Fergus Falls, at which C. Peterson, and Duffy were also present.  At that meeting, Carlson told the others that the United States Attorney had determined that the case was not going to proceed criminally, and that it would be a civil or administrative matter.  L. Peterson testified that he believed Carlson's statement, because he was an agent of the

---

[18]L. Peterson also stated that the information was consistent with what he told Duffy, and that he did not lie to his attorney about any of the facts contained in the letter, or about any business dealings, or relationships, between himself and his siblings, Van Vickle, or Rinderknecht.

[19]L. Peterson testified that he and Van Vickle were dating, and living together, at the time the letter was mailed.

Government.  Thus, the statements that L. Peterson subsequently made, on that same day, were offered under the belief that the matter was a civil case.  L. Peterson acknowledged that he was aware that Carlson had met with P. Peterson, and Rinderknecht, but he denied having any conversations with anyone about potential criminal liability, prior to July 27, 2001.

With regard to the meeting in Crookston, in the Fall of 2003, L. Peterson recalled that he was trying to settle the civil case, which had not yet been filed.  L. Peterson stated that the meeting was a discussion between Duffy and Brooker, but he did not recall who raised the issue of a criminal prosecution, other than that it would have been one of the attorneys.[20]  L. Peterson testified that his brother, O. Peterson, called Carlson a liar, because someone[21] had made representations that he was not trying to put the farm out of business, or to ruin them, and it became clear that those representations were false, as a result of some questioning about the Defendants' bank.

---

[20]Earlier, in response to a question from his attorney as to how the issue of criminal prosecution was brought up, L. Peterson testified that "[i]t was never mentioned again until the indictment came down."  See, Docket No. 74, at pp. 160-61.

[21]It is unclear from L. Peterson's testimony, whether he was speaking about Carlson or Brooker.  See, Docket No. 74, at 161-62.

Next, O. Peterson testified that he had met with Carlson on two occasions. The first meeting occurred in June of 2001,[22] at the Federal Courthouse in Fergus Falls, at which time, Carlson was investigating O. Peterson on Federal crop fraud, and they discussed subsidy payments. O. Peterson related that Carlson had said that it was a civil matter, and that he wanted to ask O. Peterson some questions about the operation of his farm. While O. Peterson was not present at the meeting on July 27, 2001, L. Peterson told him that Carlson had said that the case was civil, and not criminal, which O. Peterson accepted as truthful. O. Peterson testified that, after that date, he continued to cooperate with the investigation.

At the meeting in Crookston, on October 20, 2003, at which O. Peterson was present, the two attorneys were talking, and the word "criminal" arose. O. Peterson reacted by looking at Carlson, and calling him "a * * * liar," because when Carlson interviewed him on the first occasion, Carlson said that it was a civil matter. O. Peterson testified that Carlson said, "I didn't say that." Brooker asked Carlson if he did make that statement, and Carlson repeated that he did not, after which O. Peterson

---

[22]It appears as though O. Peterson might have been mistaken, and was actually referring to Carlson's interview of the Petersons, in June of 2000. See, <u>Docket No. 74</u>, at pp. 62-63; <u>Defendants' Joint Memorandum in Support of Motion</u>, at p. 2.

again called him "a * * * liar."  O. Peterson affirmatively stated that Duffy's version of what happened, which was consistent with Carlson's, was untrue, in that Brooker never raised his hand, or stopped any conversation.

O. Peterson testified that Duffy represented Peterson Farms, but that he did not represent O. Peterson, individually, at any time.  O. Peterson stated that he might have signed a retainer agreement with Duffy, on behalf of Peterson Farms.  He did speak with his family members, who were also partners in Peterson Farms, about retaining Duffy as an attorney, and they all agreed.[23]  However, he did not speak with anyone who was involved with Key West Farms -- namely, Van Vickle or Rinderknecht. Duffy never spoke with O. Peterson about a potential conflict of interest, even though he assumed that Peterson Farms was paying for the representation of Key West Farms, as well.[24]  O. Peterson testified that he was not a partner of Key West Farms,

---

[23]O. Peterson claimed that he did not speak with P. Peterson about the legal representation of Peterson Farms, even though she was also a partner at that time, probably because she was not present at the meeting, when they discussed it.  He stated that he might have spoken to P. Peterson after that meeting, although he did not specifically recall doing so.  O. Peterson clarified that he had spoken to L. Peterson, and his parents.

[24]O. Peterson later denied knowing that Key West Farms had retained Duffy, or knowing anything at all about what Key West had done.

which was a separate farming entity from Peterson Farms, and that the only two partners of Key West Farms were Van Vickle, and Rinderknecht.

Further, O. Peterson never attempted to obtain independent legal counsel for himself, separate from the representation of Peterson Farms, and he never had any discussions with anyone about the potential criminal liability, prior to the filing of criminal charges. O. Peterson denied knowing about Duffy's conversation, with the United States Attorney's Office about the potential criminal charges, which occurred before the original Indictment was returned in February of 2004. O. Peterson testified that, after July 27, 2001, he was never interviewed by any Government Agent, nor did he sign any type of release, or other disclosure statement following that date.

A. Peterson testified that he is fifty-five years old, and that he has a B.A., in history, from the University of Hawaii, and a J.D., from the University of Idaho. He currently lives in Idaho. A. Peterson recognized Carlson, and he stated that he had seen Carlson twice, including on the date of the Hearing. The previous time was in the second week of July of 2001, when Carlson came to A. Peterson's house in Meridian, Idaho. Although A. Peterson could not recall the exact date of the meeting, he stated that it was before July 27, 2001. The meeting had been previously arranged, and they had discussed the reason for the meeting -- namely, the farm subsidy payments -- over

the phone.   A. Peterson testified that, after the initial introductions, Carlson's first words were that the matter was civil, and that it was not going to proceed criminally. After that representation, A. Peterson proceeded to have a discussion with Carlson, which he would not have otherwise done, because of A. Peterson's awareness, through his practice of law, that he would need a person to advise him, if there were going to be criminal proceedings.   Other than the interview on that occasion, A. Peterson did not do anything else to cooperate in the investigation, including participating in any more interviews, or executing releases.[25]   A. Peterson stated that he subsequently spoke to his family, in Minnesota, and that L. Peterson told him that the case was a civil matter, and that it would not proceed criminally.   A. Peterson could not remember the date of that conversation either, but he believed that it was following the meeting on July 27, 2001.

A. Peterson testified that his experience as an attorney has involved mainly property law, and that he has not practiced law since 1980, prior to which, he practiced for two and one-half years.   However, A. Peterson did have some criminal

---

[25]A. Peterson testified that, when a release for Division 3 Farms was executed on February 5, 2000, by L. Peterson, L. Peterson was not a partner of Division 3 Farms, although he did have power of attorney.

experience with misdemeanors, as well as a capital murder appeal, which was assigned to him by his senior partner.  After he left the practice of law, A. Peterson entered the construction business, by starting up Division 3 Concrete Construction, in 1980, and he eventually became a partner in Division 3 Farms.

A. Peterson stated that he was not represented by counsel, prior to his meeting with Carlson.  Although he may have discussed the issue with L. Peterson, he did not recall the retention of counsel by himself, or by anyone on behalf of him, other than what was tangential to L. Peterson's activities with the Government.

C. Peterson, who is the brother of L. Peterson, O. Peterson, and A. Peterson, also testified.  C. Peterson attended the meeting in Fergus Falls, on July 27, 2001, the purpose of which was to obtain C. Peterson's statement.  C. Peterson testified that Carlson immediately stated that the case was going to be either civil or administrative, and that the United States Government had rejected the criminal case.  Although C. Peterson did not recall reviewing, or signing, Carlson's notes from that meeting, he stated that the signature looked like his.  See, Government Exh. 4.  Initially, C. Peterson testified that he recalled that they were supposed to get copies of the notes, but that they never did.  He later testified that they did not receive copies, because they had not requested them before the meeting started, as A. Peterson had prior to his

interview in Idaho.  C. Peterson did not speak with his brother A. Peterson, prior to the meeting on July 27, 2001.  C. Peterson testified that, if he had any idea that there was a criminal aspect to the investigation, he would not have spoken with Carlson, nor would he have signed the notes.  C. Peterson could not recall whether Duffy took notes during the meeting.

At the meeting, which lasted a couple of hours, C. Peterson was represented by Duffy.  Although C. Peterson was a partner of Division 3 Farms, he had retained Duffy personally, rather than on behalf of Division 3 Farms.  However, C. Peterson never signed a retainer, and he could not recall how he paid Duffy, but he surmised that it would have been by check.  C. Peterson stated that he did not have any discussion with anyone about the potential conflict of interest, in Duffy's representation.

Finally, Van Vickle testified that she is a house cleaner, and a farmer.  Van Vickle has been farming since 1997, and began farming on her own in 1999.  Van Vickle stated that she worked with Peterson Farms and L. Peterson, and that she used to live with L. Peterson.  According to Van Vickle, her intention was to be represented by Duffy, and she believed that she was, as demonstrated by letters, phone calls, and meetings by and with him.  At some point in time, Van Vickle was advised to cooperate with discovery, so as to facilitate the settlement of the civil case.  Van

- 35 -

Vickle testified that she was not informed that she was in danger of being charged criminally, until 2003.  In fact, Van Vickle stated that Carlson affirmatively told her that the case would not be criminal, when he came to her house on January 5, 2000.  Van Vickle identified the signature on the release, which was dated January 5, 2000, as her own, and she recalled signing the release at her first meeting with Carlson, on that same date.  See, <u>Government Exh. 1</u>.  Prior to that date, Van Vickle had not had any communication from Carlson.

Van Vickle testified that, on January 5, 2000, she was represented by Duffy but, when asked whether Duffy represented her in her personal capacity, or whether he represented Key West Farms, she replied that her understanding was that he represented both her, personally, and through Key West Farms, because they were the same entity.  Van Vickle stated that she spoke with Rinderknecht about Duffy's representation of Key West Farms after 2000, although she could not recall the specific date.  She further testified that Rinderknecht did not sign any papers, or pay any money, to have Duffy represent Key West Farms.  Rather, the attorneys fees were paid by Peterson Farms.  Van Vickle testified that she was learning more about the various farming rules and regulations, and that she was aware that there could be administrative, civil, or criminal violations, based on her conduct with the farm

payments, and that she had that understanding on January 5, 2000.  After January 5, 2000, Van Vickle was not interviewed by the Government again, nor did she sign any additional releases.

## III.  Discussion

The Defendants have jointly filed a Motion to Dismiss, as specific performance of the Government's agreement not to prosecute.  See, Santobello v. New York, 404 U.S. 257 (1971).  Additionally, the Defendants have jointly moved for the suppression of statements, and other evidence, which was allegedly obtained in violation of their Fourth and Fifth Amendment rights, and through plea negotiations.  See, Rule 410, Federal Rules of Evidence; Rule 11(f), Federal Rules of Criminal Procedure.  We address the Motions, in turn.

A.   The Defendants' Joint Motion to Dismiss as Specific Performance of the Government Agreement Not to Prosecute.

In the Defendants's Motion to Dismiss, they argue that we should specifically enforce the Government's alleged promise that the Defendants would not suffer any criminal consequences, in exchange for their cooperation with the investigation, pursuant to Santobello v. New York, 404 U.S. 257 (1971).  In their Memorandum in Support of their Motion, the Defendants' Santobello argument is

phrased as a claim for the violation of their due process rights, which warrants

dismissal, and they also rely on the doctrines of equitable immunity, and the Court's

supervisory powers, in further support of their Motion to Dismiss.[26]  We consider the

Defendants' arguments in turn, beginning with an analysis of <u>Santobello</u>, and the Due

Process Clause.

>1.    <u>The Application of Santobello, and the Due Process Clause</u>.  The

Government contends that Carlson did not make a promise not to prosecute, or enter

into a cooperation agreement, that <u>Santobello</u> is inapplicable, because that case

addresses the enforcement of plea agreements, which the Defendants, here, have not

---

[26]The Defendants further argue that we should apply the "absent witness rule," against the Government, and draw an adverse inference from Brooker's failure to testify, for which they cite <u>NLRB v. MDI Commercial Servs.</u>, 175 F.3d 621, 632 (8th Cir. 1999).  The Defendants argue that we should infer that Brooker would have "confirmed his own discomfort with the handling of the defendants' and their lawyer's understanding of the significance of their substantial cooperation to the government's investigation."  See, <u>Defendants' Joint Memorandum in Support of Motion</u>, at p. 14. We find that the application of the adverse witness rule is unwarranted in this case, where the Government argues that it did not receive sufficient notice of the bases for the Defendants' Motions, Brooker was unavailable on the date of the Hearing, and Carlson, who was the individual, along with the Defendants, with the most significant knowledge of whether a promise was made, and whether the Defendants made statements, which suggested their belief that a promise had been made, were called to testify.

entered, that Santobello has not been extended to cooperation agreements, and that dismissal is not the appropriate remedy, under the circumstances of this case.

As an initial matter, we do not agree that Santobello is **entirely** inapplicable. While Santobello involved plea agreements, and no plea agreements have been reached in this case, our Court of Appeals, in addressing an agreement not to prosecute the defendant in Federal Court, cited Santobello for the proposition that "the remedy for the breach of such a promise rests in the discretion of the trial court." See, United States v. Johnson, 861 F.2d 510, 512 (8th Cir. 1988), citing Santobello v. New York, supra at 263. The Court, in Johnson, went on to state that "dismissal of an indictment is appropriate under certain circumstances." See, United States v. Johnson, supra at 512, citing United States v. Minnesota Mining and Manufacturing Co., 551 F.2d 1106, 1112 (8th Cir. 1977). Furthermore, our Court of Appeals has noted the similarity between non-prosecution agreements, or immunity agreements, and plea agreements. See, United States v. Glauning, 211 F.3d 1085, 1087 (8th Cir. 2000)(applying the standard of review, for plea agreements, to a non-prosecution agreement); United States v. Crawford, 20 F.3d 933, 935 (8th Cir. 1994)("It is well settled that immunity agreements are analogous to plea agreements."), citing United States v. Brown, 801 F.2d 352, 354 (8th Cir. 1986); United States v. Johnson, supra at 512 ("A cooperation

agreement is somewhat analogous to a plea agreement."); United States v. Andrus, 775 F.2d 825, 845 (7th Cir. 1985)("[M]any courts have acknowledged that the principles of Santobello apply whenever a defendant acts to his detriment in reliance upon government promises."); but see, Blankenship v. Circuit Court of Cook County, 59 F. Supp.2d 736 (N.D. Ill. 1999)("The most glaring problem with [the plaintiff's] attempt to use Santobello and Mabry [v. Johnson, 467 U.S. 504 (1984)] to support his claim [that his due process rights were violated when the State terminated the cooperation agreement] is that neither Santobello nor Mabry dealt with cooperation agreements," but rather they "concerned a plea agreement, which is a wholly different type of agreement.").

"Cooperation-immunity agreements are contractual in nature and subject to contract law standards."  United States v. Johnson, supra at 512, citing United States v. Brown, supra at 354.  "[A]s a general rule, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected."  United States v. Streebing, 987 F.2d 368, 372 (6th Cir.), cert. denied, 508 U.S. 961 (1993)[quotation omitted].  "[T]he defendant bears the burden of proving the existence of the promise not to prosecute by a preponderance of the evidence."  United States

v. Holtz, 1993 WL 482953 at *4 (E.D. Pa., November 15, 1993)[citations omitted]; see also, United States v. Marks, 677 F. Supp. 1337, 1342 (E.D. Mich. 1988).

However, two conditions must be satisfied before such a promise may be enforced.   A "defendant who seeks specifically to enforce a promise, whether contained in a plea agreement or a freestanding cooperation agreement, must show both that the promisor had actual authority to make the particular promise and that he (the defendant) detrimentally relied on it," and "[i]f either part of this showing fails, the promise in unenforceable."   United States v. Flemmi, 225 F.3d 78, 84 (1st Cir. 2000)[citations omitted]; see also, United States v. Streebing, supra at 372.

A natural prerequisite to the enforcement of a promise not to prosecute is that such a promise was made, in the first instance.  In deciding that issue, the precise language that Carlson used, and at what times, is significant, and an unavoidable credibility determination will heavily influence the result we reach.  In assessing the believability of the witnesses, we have weighed their demeanor, and the consistency of their testimony with both common sense, and with the Record as a whole.  We are persuaded that Carlson, and Duffy, are the more believable witnesses, as their testimony is relatively consistent.  We specifically find that at no time, prior to July 27, 2001, did Carlson inform Duffy that the United States Attorney's Office was

considering criminal charges, nor did Duffy inquire about the status of any criminal investigations. Rather, Duffy merely assumed that the matter was solely a civil investigation. We further find that, in conducting the various interviews of the Defendants, Carlson conducted himself in accordance with his usual practice, by identifying himself as a criminal investigator, with the Department of Agriculture Inspector General's Office, by explaining that he is conducting an investigation, which could proceed criminally, civilly, and/or administratively, and by cautioning the Defendants that he does not make that determination, but rather, that he reports the facts to the United States Attorney's Office. We credit Carlson's testimony that, in his ten years of experience as a Special Agent, he has never been authorized to enter into plea negotiations, that he did not receive such authorization, or direction, from the United States Attorney's Office in this matter, and that he never represented to Duffy, or to any of the Defendants, that he had such authority.

With regard to the meeting between Carlson, Duffy, L. Peterson, and C. Peterson, on July 27, 2001, we find that Carlson informed the others that he had received a letter from the United States Attorney's Office, which had declined to prosecute the case criminally, based on the information that had been provided as of that date. He then explained that the case could still proceed civilly and/or

administratively.[27]   We further find that Duffy and L. Peterson reacted to Carlson's statements, by commenting that it would have been nice to know that it was a criminal prosecution, and that it was "never a criminal thing."  We credit Duffy's testimony that he allowed the Defendants to proceed, and cooperate, based on his understanding that it was a civil and/or administrative, but not a criminal matter.

During the meeting in the Fall of 2003, which was attended by Carlson, Brooker, Duffy, L. Peterson, and O. Peterson, we find that the Petersons, and Duffy, told Carlson that he had informed them that the criminal proceedings were over, and Carlson began to respond that he did not, before Brooker stopped him.  O. Peterson responded by swearing at Carlson, and calling him a liar.  Our foregoing findings are premised on the testimony of Carlson, and of Duffy, which was internally consistent, in most significant aspects.

However, we are not persuaded that the testimony of most of the Defendants is fully believable.  As to L. Peterson, his testimony was neither consistent internally,

---

[27]We note that Duffy testified that he did not recall exactly what he, or Carlson, had said, and that he did not write the comments down, at that time.  However, the testimony comports with C. Peterson's recollection that Carlson stated that the case would be either civil or administrative, and that the United States Attorney's Office had rejected the criminal case.

nor was it consistent with the testimony of the other witnesses. For example, he contradicted Duffy's testimony as to the letter, which was dated February 22, 2003. His testimony similarly conflicted with that of Carlson, Duffy, and his brother, O. Peterson, as to what occurred at the meeting in the Fall of 2003. With regard to that subject, he initially testified that the criminal prosecution "was never mentioned again until the indictment came down." See, Docket No. 74, at pp. 160-61. However, he later stated that he did not recall who raised the issue of a criminal prosecution. Additionally, he testified that O. Peterson had called Carlson a liar, not because of any representations as to the nature of the investigation against the Defendants, but because of a belief that someone was trying to put their farm out of business, or to ruin them, contrary to that individual's representations.

We further find that the testimony of O. Peterson is not fully believable, because his testimony, concerning the meeting in the Fall of 2003, contradicted both Duffy's, and Carlson's, which were consistent with each other, in that O. Peterson testified that Brooker never raised his hand, or stopped any conversation, whereas both Duffy and Carlson testified to the contrary. Furthermore, O. Peterson testified that, when Carlson first met with him in June of 2000, Carlson informed him that it was a civil matter. We expressly decline to credit O. Peterson's testimony in that respect,

- 44 -

because it was inconsistent with Carlson's normal practice, which we have found that he followed in his meetings with the Defendants, and because it was approximately a year prior to the decision of the United States Attorney's Office not to prosecute, and the communication of that information to Carlson. Accordingly, it is highly unlikely that Carlson would have informed O. Peterson that the case was a civil matter, when he did not have any information, at that time, which would lead him to conclude that a criminal prosecution had been declined. For the same reasons, we find that Van Vickle's testimony, that Carlson affirmatively told her the case would not be criminal, at their first meeting on January 5, 2000, is not credible.

However, by the time that Carlson met with A. Peterson, in July of 2001, he did know of the declination letter, and we credit A. Peterson's testimony, to the extent that we find that Carlson would have made similar representations, as he did at the meeting on July 27, 2001, that the matter would proceed civilly. Finally, we find that C. Peterson's testimony was not entirely credible, in that it was internally inconsistent, with regard to Carlson's notes. He first testified that he was supposed to get copies of the notes, and that he did not, but he later testified that he did not receive copies of the notes, because they had not requested them before the meeting started, as had A.

Peterson.  However, C. Peterson testified that he did not speak with A. Peterson prior to the meeting on July 27, 2001.

Having made the foregoing credibility determinations, we find that Carlson did not make any promises, to any of the Defendants, that they would never be criminally prosecuted.  Undoubtedly, Duffy, L. Peterson, and C. Peterson, subjectively interpreted Carlson's report that the criminal prosecution had been declined, as a statement that the criminal proceedings were concluded.  The Defendants' subjective expectations, or beliefs, do not create an agreement, where one was not otherwise made.  See, United States v. Minnesota Mining & Mfg. Co., 551 F.2d 1106, 1111 (8th Cir. 1977)("The court did not extrapolate an 'agreement' from the subjective expectations of defendants, * * * or from defendants' chimerical beliefs as to what was to be included in the agreement," but rather the "Court based its ultimate findings of fact on actual promises made by [the prosecuting authorities] and accepted by [the defendants] on the subject of immunity from future criminal prosecutions."); see also, United States v. Johnson, 711 F. Supp. 506, 509-10 (D. Minn. 1989)(declining to find that the agreement between the parties was a "firm commitment to forgo federal prosecution in exchange for [the defendant's cooperation]," even where the defendant, and her attorney, misunderstood the terms of the agreement, and "sincerely believed"

that it was a firm commitment of non-prosecution); United States v. Holtz, supra at *7 ("The Government should not be expected to be responsible for every defendant's wishful interpretation of a statement made during meetings."); United States v. Marks, supra at 1343 ("This Court finds that [the defendant] honestly believed an agreement existed, but finds [the defendant's] testimony credibly only as a reflection of his beliefs and not as proof that an agreement actually existed.").  Carlson's statements, however inartful, did not constitute a promise that the Defendants would never be prosecuted.

Our conclusion is supported by the fact that the alleged agreement was not in writing, although that is not always required, and that Duffy never followed up on the alleged promise, by confirming it with a member of the United States Attorney's Office, until at least the Fall of 2003, or approximately a year and one-half after the alleged promise was made, despite the fact that Duffy engaged in extended discussions with the United States Attorney's Office about the possibility of a "global settlement." Furthermore, Duffy acknowledged that neither Koch, nor Brooker, ever made any direct statements about the nonprosecution of the Defendants.  Finally, Duffy also acknowledged that the nature of an investigation might change, upon the discovery of

new evidence, and a statement that a case has been declined for prosecution, is not the same as a promise of lifetime immunity.

In any event, there was clearly no meeting of the minds, which precludes a finding that an agreement was reached, such that the Defendants would never be prosecuted, in exchange for their cooperation in the civil proceedings. United States v. Lua, 990 F. Supp. 704, 710 (N.D. Iowa 1998)("In order to create a valid contract, the parties must come to a 'meeting of the minds.'), quoting Restatement (Second) of Contracts, §17, comment c (1981), and citing cases. Accordingly, we find that no promise of immunity, or non-prosecution, was made to the Defendants, at any point in time. In the absence of such a promise, the Defendants' arguments fail, and therefore, we recommend that the Defendants' Motion to Dismiss be denied.

Even if we found that a promise was made to the Defendants by Carlson, he did not have the authority to make such a promise, as is required in order to obtain specific performance of the agreement. See, United States v. Flemmi, supra at 84; United States v. Streebing, supra at 372. "Under traditional agency law * * *, authority can be either actual or apparent" but, "with respect to the United States, authorization must be in the form of actual authority because the doctrines of estoppel and apparent authority usually do not apply to bind the government." United States v. Lua, supra

at 713 n. 4, citing <u>Margalli-Olvera</u>, 43 F.3d 345, 353 (8th Cir. 1994), citing, in turn,

<u>Thomas v. I.N.S.</u>, 35 F.3d 1332, 1338 (9th Cir. 1994); see also, <u>United States v.</u>

<u>Flemmi</u>, supra at 85 ("As a general rule, doctrines such as estoppel and apparent

authority are not available to bind the federal sovereign.").  "[A]ny promise the FBI

agent made * * * is unenforceable, as [the defendant] failed to demonstrate the agent

was authorized to make such a promise."  <u>United States v. Dennie</u>, 208 F.3d 218, 2000

WL 268492 at *1 (8th Cir., March 10, 2000), citing <u>United States v. Streebing</u>, supra

at 372; <u>United States v. Kettering</u>, 861 F.2d 675, 678 (11th Cir. 1988); see also, <u>United</u>

<u>States v. Lua</u>, supra at 713-14 ("[C]ourts have held that FBI and other federal law

enforcement agents do not have authority to offer cooperation or plea agreements to

defendants."), citing cases; but cf. <u>United States v. Carrillo</u>, 709 F.2d 35 (9th Cir.

1983)(dismissing the Indictment where DEA Agents offered not to prosecute, in

exchange for the defendant's cooperation, but without discussing the Agents'

authority); <u>United States v. Vergara</u>, 791 F. Supp. 1095 (N.D. W. Va. 1992)

(Government did not argue that the Narcotics Task Force lacked the authority to bind

it).

   Here, Carlson testified that he had never been authorized to enter into plea

negotiations, that he did not receive such authorization, or direction, from the United

States Attorney's Office in this matter, and that he never represented to Duffy, or to any of the Defendants, that he had such authority.   Carlson's testimony is uncontroverted and, even though the Defendants, and Duffy, might have assumed that he had such authority, that assumption was erroneous.  Since we find that Carlson did not have the authority to make any alleged promises to the Defendants, they are not entitled to specific performance.   Accordingly, it is unnecessary for us to consider whether the Defendants acted in detrimental reliance, on the alleged promises.[28]

Finally, as we have noted, "the remedy for the breach of such a promise rests in the discretion of the trial court."   United States v. Johnson, supra at 512, citing Santobello v. New York, supra at 263.  "Specific performance of an agreement not to prosecute is appropriate **unless**" one of the following conditions are present: 1) "the

_____

[28]While we note that the Defendants, and Duffy, testified to several actions that they took, in reliance on their understanding that the matter would be civil, and not criminal, our Court of Appeals, in United States v. Coon, 805 F.2d 822, 825 (8th Cir. 1986), stated, in the context of a plea agreement, that "[t]he only change in position that can be considered 'detrimental reliance' is the actual entry of an involuntary guilty plea" because, until that time, "the defendant [has not] been deprived of any constitutionally protected liberty interest," and any cooperation, on the part of the defendant, can be remedied by exclusion from Trial, if it was involuntary. Furthermore, we question whether the Defendants' cooperation can be directly connected to Carlson's alleged promise at the meeting, on July 27, 2001, because they had already expressed their willingness to cooperate, and had done so, prior to obtaining the alleged promise of non-prosecution.

government made no firm promise of immunity;" 2) "the defendant failed to fulfill her part of the bargain;" 3) "the government's offer of immunity or the defendant's acceptance was based on a mistake in law or fact;" 4) "the term for which the defendant seeks specific performance was not a term of the contract;" 5) "the government's decision to seek an indictment was made in good faith;" 6) "the government's breach resulted in no prejudice to the defendant;" **or** 7) "specific enforcement would have an adverse impact on the public." Id. at 512-13 [emphasis added].

Here, we find, as we have detailed, that the Government did not make a firm promise of immunity. Further, it is conceivable that either the Defendants failed to fulfill their part of the bargain, or that the Government's offer of immunity, if there was one, was based on a mistake in law or fact, due to the allegations that some of the Defendants instructed certain witnesses to lie, or provided the answers that the witnesses should give, in response to questioning. Finally, specific performance, in this case, would adversely affect the public, in that the Defendants are accused of a wide-ranging conspiracy, involving a significant amount of money. For those additional reasons, we find that, even if there was a promise not to prosecute, and even if Carlson had the authority to make such a promise, specific performance, in the form

- 51 -

of dismissal, would be entirely inappropriate, and we recommend that the Court decline to use its discretion to dismiss the Indictment.

2.    The Application of the Doctrine of Equitable Immunity. "Although the concept of equitable immunity is not well defined, Rowe v. Griffin, 676 F.2d 524, 526 n. 3 (11th Cir. 1982), 'the underlying principle is that when a promise of immunity induces a defendant to * * * cooperate with the government to his [or her] detriment, due process required that the prosecutor's promise be fulfilled.'" Reed v. United States, 106 F.3d 231, 235 (8th Cir. 1997), quoting United States v. Fuzer, 18 F.3d 517, 521 (7th Cir. 1994). "[P]ursuant to the concept of 'equitable immunity' courts may enforce informal grants of transactional immunity where: '(1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.'" United States v. Lua, supra at 709-10, quoting United States v. McHan, 101 F.3d 1027, 1034 (4th Cir. 1996), quoting, in turn, Rowe v. Griffin, supra at 527-28.

We have already determined that Carlson did not make any promises of non-prosecution to the Defendants, and that no agreement was entered by the parties. Furthermore, "the Government's mere failure to announce * * * that no agreement

existed, is conduct which is far too equivocal to create an agreement by estoppel." United States v. Marks, supra at 1344. Accordingly, we find that the doctrine of equitable immunity is inapplicable, and we recommend that the Defendants' Motion to Dismiss be denied.

        3.    The Application of the Court's Supervisory Powers. "The power of a district court to dismiss a grand jury indictment under the supervisory powers doctrine is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." United States v. Streebing, supra at 371, citing cases. "[D]ismissal of an indictment is a drastic remedy, which is appropriate only in truly egregious cases." Id. at 372, citing United States v. Morrison, 449 U.S. 361 (1980)[quotation omitted]; see also, United States v. Roberts, 1998 WL 278293 (N.D.N.Y., May 19, 1998)(calling the dismissal of an Indictment an "extreme sanction."). For the reasons we have previously expressed, we find that the invocation of the Court's supervisory powers is unwarranted, in this matter, and we recommend that the Defendants' Motion to Dismiss be denied in its entirety.

        B.    The Defendants' Joint Motion to Suppress.

1.  <u>Standard of Review</u>.  Government agents are not required to administer Miranda warnings to everyone whom they question.  See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977).  Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 428-29 (1984).  "Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect."  <u>United States v. Mendoza-Gonzalez</u>, 363 F.3d 788, 795 (8th Cir. 2004), citing <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  However, "<u>Miranda</u> has no application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1357 (8th Cir. 1990), citing <u>United States v. McGauley</u>, 786 F.2d 888, 891 (8th Cir. 1986), and <u>United States v. Webster</u>, 769 F.2d 487, 492 (8th Cir. 1985).

Indeed, our Court of Appeals has "'repeatedly held that "[a] voluntary statement made by a suspect, not in response to interrogation, is not barred [by the Fifth Amendment] and is admissible with or without the giving of <u>Miranda</u> warnings."'" <u>United States v. Turner</u>, 157 F.3d 552, 556 (8th Cir. 1998), quoting <u>United States v. Hatten</u>, 68 F.3d 257, 261 (8th Cir. 1995), quoting, in turn, <u>Rhode Island v. Innis</u>, supra at 299; <u>United States v. Cunningham</u>, 133 F.3d 1070, 1074 (8th Cir. 1998)(where officers merely listen to suspect, nothing prohibits use of suspect's statements against him); <u>United States v. Hayes</u>, 120 F.3d 739, 744 (8th Cir. 1997)("'<u>Miranda</u> does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'"), quoting <u>United States v. Hawkins</u>, 102 F.3d 973, 975 (8th Cir. 1996), citing, in turn, <u>Butzin v. Wood</u>, 886 F.2d 1016, 1018 (8th Cir. 1989); <u>United States v. Kalter</u>, 5 F.3d 1166, 1168-69 (8th Cir. 1993)(<u>Miranda</u> does not require suppression of spontaneous utterances which are not the product of interrogation); <u>United States v. Waloke</u>, 962 F.2d 824, 828-29 (8th Cir. 1992) (suspect's spontaneous statements, while in transit to a detention center, were voluntary, were not the product of interrogation, and did not require the administration of a <u>Miranda</u> warning).

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'"   Davis v. United States, 512 U.S. 452, 458 (1994), quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981).   Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him."   Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).   The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights.   See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987).   The Sixth Amendment additionally provides that, "[i]n all criminal trials, the accused shall enjoy the right * * * to have the assistance of counsel for his defense."   This right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" and, once invoked, the right cannot be waived in a subsequent police-initiated custodial interview. Kirby v. Illinois, 406 U.S. 682, 689 (1972); see also, Michigan v. Jackson, 475 U.S. 625, 636 (1986).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.  See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000).  For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."   Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").  The determination "depend[s] upon
> a weighing of the circumstances of pressure against the power of resistance of the person confessing."  Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a <u>Miranda</u> warning has been given, see, <u>Withrow v. Williams</u>, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986); the length of the interrogation, see, <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, <u>Reck v. Pate</u>, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, <u>Leyra v. Denno</u>, 347 U.S. 556, 561 (1954).  See also, <u>Withrow v. Williams</u>, supra at 693 (listing the applicable considerations).

        2.    <u>Legal Analysis</u>.  The Defendants argue that the Motion to Suppress should be granted, for the same reasons expressed in their Motion to Dismiss -- namely, as a result of the violation of their due process rights, and as an exercise of the Court's supervisory powers.   They further argue that their cooperation was involuntary and, as a result, any statements, or evidence, that was obtained from their cooperation, should be suppressed.[29]   We have already found that the Defendants'

---

[29]In their Motion to Suppress, the Defendants also rely on the Supreme Court's decision in <u>Raley v. Ohio</u>, as well as an application of Rule 410, Federal Rules of Evidence, and Rule 11(f), Federal Rules of Criminal Procedure.  Those arguments appear to have been abandoned in their supporting Memorandum, but in the interests of completeness, we briefly address them.

        (continued...)

- 58 -

due process rights were not violated, and that an exercise of the Court's supervisory

powers is unwarranted, because Carlson did not make any promises that the

_____

[29](...continued)

The Defendants have argued that <u>Raley v. Ohio</u>, was applicable because there, as here, the defendants relied to their detriment on the misleading, and incorrect advice, of Government actors. However, the Court in <u>Raley</u> "was concerned with the unique due process concerns raised when a government official in an unmistakable position of authority affirmatively misleads a citizen as to the **propriety of contemplated actions.**" <u>United States v. Hardridge</u>, 379 F.3d 1188, 1193 (10th Cir. 2004)[emphasis added]; see also <u>United States v. Caron</u>, 64 F.3d 713, 716 (1st Cir. 1995); <u>United States v. Perez-Torres</u>, 15 F.3d 403, 406-07 (5th Cir. 1994)(noting that in the cases cited by the defendant, including <u>Raley</u>, "the government misled the defendant about the **legality** of certain **conduct**.")[emphasis in original]. Here, neither Carlson, nor any other Government actor, advised the Defendants as to the legality of any conduct, and as such, <u>Raley v. Ohio</u>, is inapplicable.

Second, Rule 410, and Rule 11(f), limit the inadmissibility of certain statements, to those "made in the course of discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn." <u>Rule 410, Federal Rules of Evidence</u>. As an initial matter, we express our doubt as to whether the Defendants ever engaged in plea bargaining, such that these Rules would apply. Furthermore, no attorney, for the prosecuting authority, was present at the majority of the meetings, about which testimony was received, particularly the meeting on July 27, 2001. Nor was Carlson acting on behalf of the United States Attorney's Office, at any of those meetings. Compare, <u>United States v. Millard</u>, 139 F.3d 1200 (8th Cir. 1998), with <u>United States v. Brumley</u>, 217 F.3d 905 (7th Cir. 2000). We need not consider whether any of the other "statements" by the Defendants fall within the confines of the Rules, as the argument has not been advanced further, nor have the Defendants specifically identified any conversations, which would be implicated by the Rules. Accordingly, we decline to apply them, at this juncture, but the Defendants may raise the issue, if any such statements, to which the Rules may be applicable, are attempted to be introduced at Trial.

Defendants would not be prosecuted.  We likewise reject the same arguments as a basis for suppressing the Defendants' statements, or other evidence, which were the product of their cooperation.  We also note that the Defendants do not challenge the statements, or evidence, on the basis of a <u>Miranda</u> violation -- presumably since they were never in custody -- or as being in violation of their Fifth or Sixth Amendment rights to an attorney.

With regard to the Defendants' arguments as to the voluntariness of their cooperation, we find that the Defendants' statements, and cooperation, were voluntary, at all relevant times.  We have already found that, in conducting the various interviews of the Defendants, Carlson conducted himself in accordance with his usual practice, by identifying himself as a criminal investigator, with the Department of Agriculture Inspector General's Office, by explaining that he was conducting an investigation, which could proceed criminally, civilly, and/or administratively, and by cautioning the Defendants that he did not make that determination, but rather, that he reported the facts to the United States Attorney's Office.  As a result, the Defendants were clearly placed on notice of the possibility of a criminal investigation, prior to any cooperation on their part.  Nevertheless, the Defendants, through Duffy, stated that they were "more than willing to cooperate with [the] investigation because they do not

have anything to hide."  Government Exh. 2.  Prior to any statement, by Carlson, that

the criminal prosecution had been declined, the Defendants cooperated with Carlson's

investigation, by executing releases, and by agreeing to speak with Carlson, on various

occasions, and L. Peterson, and C. Peterson, intended to do the same at the meeting

on July 27, 2001.  They continued to perform in the same manner, after they were

informed that the criminal prosecution had been declined.

Furthermore, we note that Carlson did not attempt to trick, or deceive, the

Defendants into cooperating, by making promises that they would not be prosecuted.

Rather, the statements that Carlson did make -- namely, that the criminal prosecution

had been declined, and that the case would proceed as a civil and/or administrative

matter -- were entirely truthful, to the best of Carlson's knowledge, at the time that he

made them.   See, United States v. Flemmi, supra at 91-92 (finding a statement

voluntary where there was "no evidence of consciously misleading conduct on the part

of the FBI agents.").   We have found that Carlson did, in accordance with his usual

practice, advise each of the Defendants of the general possibility of a criminal

proceeding but, even if he did not, the failure to advise a defendant of the possibility

of Federal prosecution is not a misrepresentation.  See, Arkebauer v. Kiley, 985 F.2d

1351, 1360-61 (7th Cir. 1993), quoting United States v. Jordan, 870 F.2d 1310, 1316-

17 (7th Cir.), cert. denied, 493 U.S. 831 (1989).  "[A] defendant's mistaken belief about the scope of a police officer's promise did not render the confession involuntary."  Id. at 1361, citing Pharr v. Gudmanson, 951 F.2d 117, 120 (7th Cir. 1991).

Finally, the Defendants had ample reason to voluntarily cooperate with the investigation, due to the possible imposition of significant civil fines.  Cf., United States v. Hebel, 668 F.2d 995 (8th Cir. 1982)(holding that the Record "support[ed] a finding that all disclosures were freely made by defendants in hope that they would not be prosecuted rather than in reliance upon any governmental promise of immunity.").  Simply stated, there is no showing that the Defendants' will was overborne, in obtaining their cooperation in this matter, and accordingly, we recommend that the Defendants' Motion to Suppress be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Defendants' Joint Motion to Dismiss [Docket No. 59] be denied.

2.    That the Defendants' Joint Motion to Suppress [Docket No. 60] be denied.

3.     That the Defendants' Joint Motion to Strike the Government's Response [Docket No. 83] be denied, as moot.

Dated: March 9, 2005          s/Raymond L. Erickson
                              Raymond L. Erickson
                              UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 25, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 25, 2005**, unless all interested

- 63 -

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.